# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**BARBARA FLUHARTY JOWERS DARWIN,**

**Plaintiff,**

-vs-                                          Case No.  6:04-cv-347-Orl-31DAB

**ANTHONY J. PRINCIPI, Secretary of Veterans Affairs,**

**Defendant.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

This cause came on for consideration without oral argument on the following motion filed herein:

| | |
|---|---|
| **MOTION:** | **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT (Doc. No. 33-1)** |
| **FILED:** | **February 1, 2006** |

**THEREON** it is **RECOMMENDED** that the motion be **GRANTED**.

Plaintiff Barbara Fluharty Jowers Darwin filed suit against Defendant Anthony J. Principi, in his official capacity as Secretary of Veterans Affairs ("the VA"), alleging discrimination in employment under the Rehabilitation Act, 29 U.S.C. § 501 *et seq*.  Plaintiff alleges the VA discriminated against her when it failed to accommodate her disabilities, forced her to retire for financial reasons, and retaliated against her due to a union complaint.  The VA seeks summary

judgment on Plaintiff's claims, contending that she does not have a disability within the meaning of the Rehabilitation Act, she was not a qualified individual under the Act, and she voluntarily retired and was not constructively discharged.  Because the Court finds that Plaintiff is not disabled, not otherwise qualified to perform the position of charge nurse, and she failed to seek an accommodation that was "reasonable," it is respectfully **RECOMMENDED** that the VA's Motion for Summary Judgment be **GRANTED**.

### STANDARD FOR SUMMARY JUDGMENT

A party is entitled to judgment as a matter of law when the party can show that there is no genuine issue as to any material fact. FED. R. CIV. PRO. 56(c).  The substantive law applicable to the case determines which facts are material.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the burden of proving that no genuine issue of material fact exists.  *Celotex*, 477 U.S. at 323.  In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolves all reasonable doubts against the moving party.  *Anderson*, 477 U.S. at 255.

### BACKGROUND FACTS[1]

Plaintiff began working at the Bay Pines VA Medical Center Acute Psychiatric Ward in 1990, and remained there until 1997 when she suffered a work-related shoulder injury.  At that time the VA

---

[1]The facts are either undisputed or read in the light most favorable to Plaintiff, as they must be at the summary judgment stage. *Anderson*, 477 U.S. at 255.

transferred her to the Substance Abuse Treatment Program, where she worked as a charge or "residential" nurse from 1996 to August 2001. Doc. No. 33-5 Ex. 5; Doc. No. 33-3 at 2 (Darwin Dep. at 59). Beginning in August 2001, Plaintiff developed a hearing impairment and was placed in a position collecting and inputting "Addiction Severity Assessments" (hereinafter "ASA work") as "an accommodation for [her] hearing problem." *Id*.; Doc. No. 33-2 at 11; 33-3 at 2 (Darwin Dep. at 38, 59). Plaintiff also aggravated a back condition on August 5, 2001, when she slipped on a piece of apple at work, but she continued to work with treatment of cortisone injections and other medications. Doc. No. 33-2 at 11 (Darwin Dep. at 28-30). Before the August 2001 accommodation, Plaintiff testified she was also the "working program manager," and "she did a lot of things besides just working on the unit." Doc. No. 33-3 at 2 (Darwin Dep. at 60).

Plaintiff's supervisor, Ms. Wilson, attests that Plaintiff's assignment to perform the ASA work was a temporary duty assignment to which Plaintiff was assigned in August 2001 because she was able to communicate (despite her hearing loss) when interviewing the patients face-to-face about their addictions. Doc. No. 33-7 (Wilson Decl.) ¶ 4-5. The addiction severity assessment work was routinely performed by all employees in the SATP, including nurses, social workers and psychologists. *Id*. ¶ 5. However, in order to accommodate Plaintiff from August 2001 to January 2002, Ms. Wilson temporarily reassigned those duties to Ms. Darwin from other employees pending a medical determination about her hearing[2]. *Id.* The VA also provided Plaintiff with amplified phone equipment for her hearing impairment. Doc. No. 33-8 (Herter Decl.) ¶ 3. Given the workload in the SATP unit, however, the Plaintiff performed regular charge nurse duties in addition to addiction

_____

[2]The ASA work was reassigned back to the other employees in the SATP after Plaintiff went on leave in January 2002 because the assessments are important in the SATP and need to be maintained. Doc. No. 33-7 at 6 ¶ 11.

severity interviews.  Doc. No. 33-3 at 2, 5 (Darwin Dep. at 60, 69, 95-96; 122-26).  When performing the regular charge nurse duties, Plaintiff was the only one on the unit on evening shift, night times, and weekends.  Doc. No. 33-3 at 3 & 5 (Dep. at 61, 72).  During the day, when there were 36 patients on the floor, there would only be one nurse on, sometimes with an LPN assisting.  Doc. No. 33-3 at 3 (Dep. at 71).  During admissions week (once a month) there would be two registered nurses on for the admissions.  Doc. No. 33-3 at 3 (Dep. at 72).

In the modified charge nurse capacity, Plaintiff conducted admitting interviews of patients; made rounds in the unit took admission vital signs; did data entry of interviews, assessments, progress reports; talked with patients one-on-one; made rounds on the unit to observe residents; conducted breathalysers and collected urine samples for drug screening; and conducted weekend orientation classes for new patients being admitted.  Doc. No. 33-5 at 15, Ex. 5; Doc. No. 33-7, Att. 1; Doc. No. 33-7 (Wilson Decl.) ¶ 3 & Att.1; Doc. No. 33-3 at 2-6; 33-4 at 3 (Darwin Dep. at 59-76; 122-23).  Plaintiff continued doing regular nursing duties on the SATP unit until January 2002, when Plaintiff's treating physician put her on leave due to the pain from her back problems (spondylolisthesis or chronic sciatica, lumbar strain[3]), advising her that she needed surgery.  Doc. No. 33-5 at 13, 21-22 (Ex. 4 & 8); Doc. No. 33-6 at 9, Ex. 14.  The medical form provided to Plaintiff's supervisor stated that "Ms. Darwin is no longer able to work [secondary] to her severe low back condition and thus is on [temporary disability] until after anticipated surgery."  Doc. No. 33-2 at 9 (Darwin Depo. at 30); Doc. No. 33- 5 at 13, Ex. 4; Doc. No. 33-7 (Wilson Decl.) ¶ 6.

-------

[3]Plaintiff also had a prior shoulder injury which had recovered so well that "at that time, with this surgery, [the shoulder] had got so good I could have thrown a football. . . . [T]he shoulder was great."  Doc. No. 33-2 at 13 (Darwin Dep. at 48).  Plaintiff does not raise that as a disability in her Complaint.

Plaintiff sent Ms. Wilson an email on March 26, 2002 that said she had visited her orthopedic's office that morning and he "has agreed to return me to light duty (against his better judgment) due to financial hardship."  Doc. No. 33-5, Ex. 6; Doc. No. 33-3 (Darwin Dep. at 77-79). "The return to work is for Monday April 1st, following 5 days on the [treatment].  Surgery is postponed [sic] until WC makes a decision, which might take forever. . . . Hope you can find something for me to do."  *Id.*  The note from Dr. Davis read:  "Patient may return to light duty 04/01/02 with no patient physical contact due to back problems."  Doc. No. 33-5, Ex. 7.  Plaintiff's doctor advised her not to go back to work because she needed to have the back surgery first.  Doc. No. 33-3 at 7 (Darwin Dep. at 77).  Plaintiff understood the note to mean that she could not do anything physically with patients that would hurt her back. Doc. No. 33-3 at 7 (Darwin Dep. at 80).  When Plaintiff returned to work on April 1, 2002, Ms. Wilson initially provided her with office work doing computer data entry. Doc. No. 33-7 (Wilson Decl.)  ¶ 8.  However, Wilson contacted her supervisor, Diane Lipe, expressing concern that Plaintiff might injure herself or patients; Lipe advised Wilson to have Plaintiff fill out a reasonable accommodation form. Doc. No. 33-7 (Wilson Decl.) ¶¶ 8-9; Doc. No. 33-3 at 8 (Darwin Dep. at 84).  Wilson attests that she was uncertain of Plaintiff's medical restrictions and feared that Plaintiff could injure herself or a patient, so she asked Plaintiff to go home pending the processing of the accommodation form; Plaintiff's last day was April 11, 2002 and she did not return prior to her September 30, 2002 retirement. Doc. No. 33-2 at 5 (Darwin Dep. at 14); Doc. No. 33-7 (Wilson Decl.)  ¶ 12.

In a Request for Reasonable Accommodation form completed by Dr. Davis on April 2, 2002, he indicated that Plaintiff's problem was "L4-5 Spondylolisthesis/lumbar strain."  Doc. No. 33-5 at 21, Ex. 8.  Dr. Davis defined Plaintiff's restrictions as: lifting - ten pounds; walking - "20 min.";

standing - "10 min."; no reaching; limited bending or stooping; "minimal to none" push/pull requirements; and "no [work on] high risk units."  Doc. No. 33-5 at 21, Ex. 8.  Plaintiff also submitted her "Employee Request for Modified/Light Duty Work Assignment" form dated April 2, 2002.  Doc. No. 33-5 at 22, Ex. 8.  In it, she described her disability as "lumbo-sacral strains"and "sciatica - have been on light duty for work related shoulder injury- permanent since 1997."  Doc. No. 33-5 at 22. Plaintiff described the job duties that she could not do as: "lift, carrying, turn, push, pull patients, take downs, and high risk areas."  Doc. No. 33-5 at 22.  Plaintiff noted in the form that "I can do CPR - was certified ACLS for years."  *Id*.  She also noted that she would need an amplified phone and orthopedic chair, which she already had.  *Id*.

Ms. Wilson reviewed the form, comparing the restrictions to the light-duty position that Plaintiff had held in the SATP since 1997.  Wilson determined that she was unable to accommodate Plaintiff because of the more significant restriction involving no physical patient contact, which effectively prevented plaintiff from performing CPR.  Doc. No. 33-7 (Wilson Decl.) ¶¶ 10-11.  In the portion of the form reserved for supervisory action, Ms. Wilson checked the section that said "After reviewing the employee's request for a non-work related reasonable accommodation, I am not able to grant this request because" and handwrote in, "unresolved hearing loss, inability to have patient contact necessary for nursing duties including ability to perform CPR."  Doc. No. 33-5 at 23.

Below Ms. Wilson's note, Diana Lipe, the nursing services chief, agreed with Ms. Wilson's decision.  *Id.*  Ms. Wilson sent Plaintiff an email on April 11, 2002, telling Plaintiff that she "was sorry to inform [her] that the decision by Nursing Service is that we cannot further accommodate [her] in a nursing position."  Doc. No. 33-5 at 25, Ex. 9.  Ms. Wilson further stated: "My advice, after

consulting with Dr. Lipe, is to have you see Kate Cramer to explore any other options for accommodation, if you so choose." Doc. No. 33-5 at 25, Ex. 9.

Plaintiff's Request for Reasonable Accommodation Form was also reviewed by the nurse search committee for vacant nursing positions. Doc. No. 33-5 at 23, Ex. 8; Doc. No. 33-7 (Wilson Decl.) ¶ 12. Based upon the physical restrictions and the hearing loss, the search committee was unable to locate any nursing positions at Bay Pines. Doc. No. 33-7 (Wilson Decl.) ¶ 12. Plaintiff's file was forwarded to Human Resources for review by the Reasonable Accommodation Committee, and as part of this process, Plaintiff was sent an application form to complete for non-nursing positions. *Id.* Human Resources also sent Plaintiff a medical questionnaire for her doctor to complete, seeking updated medical information and suggested accommodations. Doc. No. 33-7 (Wilson Decl.) ¶ 13; Doc. No. 33-8 ("Herter Decl.") ¶ 4-6.      However, Plaintiff never returned the application for non-nursing positions because she did not want to be reassigned to a non-nursing job. Doc. No. 33-7 (Wilson Decl.) ¶ 13; Doc. No. 33-8 (Herter Decl.) ¶ 5; Doc. No. 33-3 at 14 (Darwin Dep. at 105) (did not fill out any paperwork for a non-nursing position; would not have accepted non-nursing position unless it meant no cut in pay). Plaintiff consistently stated that upon submission of additional medical information, she wanted to be reconsidered for a nursing position. Doc. No. 33-7 (Wilson Decl.) ¶ 14; Doc. No. 33-6 at 7, Ex. 13.

At the Reasonable Accommodation Committee meeting on June 10, 2002, the occupational health doctor at Bay Pines VAMC, a member of the committee, felt additional medical information was needed before the committee could consider Plaintiff's request for accommodation. Doc. No. 33-8 (Herter Decl.) ¶ 6. Human Resources sent Plaintiff a medical update questionnaire for her doctor to complete regarding Plaintiff's physical condition. *Id.*

In a letter dated July 3, 2002, Plaintiff's doctor opined that Plaintiff could perform occasional CPR; the letter was provided to Human Resources by Plaintiff on August 12, 2002. Doc. No. 33-6 at 22, Ex. 19; Doc. No. 33-8 (Herter Decl.) ¶ 7.  Enclosed with the letter was a July 22, 2002 office visit sheet from Dr. Davis which limited the plaintiff to light duty and no excessive walking, no pushing or pulling, no climbing, no bending, no repetitive lifting, no lifting over 10 pounds, and no kneeling, crawling or squatting.  Doc. No. 33-6 at 11, Ex. 15; Doc. No. 33-8 (Herter Decl.) ¶ 8.

On September 6, 2002, Plaintiff sent an email to Ms. Herter in Human Resources asking if Bay Pines had received the completed medical questionnaire from Dr. Davis.  Doc. No. 33-8 (Herter Decl.) ¶ 9.  Ms. Herter responded that the form had not been received, and Plaintiff told Herter that she had an appointment with Dr. Davis on September 16, 2002.  *Id.*  Plaintiff's email said that she had sent the medical questionnaire to Dr. Davis' office, "to be mailed back to [Herter], guess his staff is slow." Doc. No. 33-8 (Herter Decl.) at 14.  On September 27, 2002, Plaintiff contacted Barbara Herter by telephone and stated that she wanted to retire. Doc. No. 33-8 (Herter Decl.) ¶ 9.  Plaintiff completed her retirement paperwork and retired effective September 30, 2002.  Doc. No. 33-2 at 5; 33-4 at 10 (Darwin Dep. at 14; 150-52); Doc. No. 33-6 at 17, Ex. 17; Doc. No. 33-8 (Herter Decl.)  ¶ 10.

Sometime after October 1, 2002, Bay Pines received the medical update questionnaire signed by Dr. Davis on September 12, 2002 stated that Plaintiff was unable to do any hands-on patient care and had a 20 pound lifting restriction. Doc. No. 33-8 at 16-17.  Dr. Davis cleared Plaintiff for patient assessments, data entry, and other sedentary work.  Doc. No. 33-6 at 9, Ex. 14; Doc. No. 33-8 (Herter Decl.) ¶ 11.  Because Plaintiff had retired on September 30, the new information from Dr. Davis was not considered by the reasonable accommodation committee. Doc. No. 33-8 (Herter Decl.)  ¶ 11.

### ANALYSIS

The VA seeks summary judgment on Plaintiff's Rehabilitation Act claim, contending that Plaintiff cannot show that she has a disability within the meaning of the Act, and she is not a qualified individual with a disability because she could not perform essential functions of the job with or without accommodation. The VA also seeks summary judgment on other claims that Plaintiff might arguably be asserting for age or gender discrimination and retaliation.

To establish a case of discrimination under the Rehabilitation Act, Plaintiff must show that she is a qualified person with a disability who was subjected to unlawful discrimination as the result of her disability. *Sutton v. Lader*, 185 F.3d 1203, 1207 (11th Cir. 1999). To be a "qualified" person, a plaintiff must be able to perform the essential functions of her job, with or without reasonable accommodation. *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000). In determining whether a violation of the Rehabilitation Act has occurred, courts apply the standards under the Americans with Disabilities Act (ADA). *Holbrook v. City of Alpharetta, Ga.*, 112 F.3d 1522, 1526 n.2 (11th Cir. 1997) (citing 29 U.S.C. § 794(d)).

#### *Whether Plaintiff has a Disability that Substantially Limits A Major Life Activity*

A person is disabled if she has "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A). The regulations[4], define "major life activities" to mean "functions, such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(h)(2)(I); 29 C.F.R. § 1614.203(b) (the Rehabilitation Act regulations incorporates ADA

---

[4] "There are two potential sources of guidance for interpreting the terms of [the statute's definition of disability] – the regulations interpreting the Rehabilitation Act . . . and the EEOC regulations interpreting the ADA." *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams,* 534 U.S. 184, 193 (2002).

standards).  The appendix to the regulations explains that the preceding list is not exhaustive, but also includes standing, reaching, and lifting.  The regulations further provide that "other major life activities include, but are not limited to, sitting, standing, lifting and reaching." 29 C.F.R. § 1630, Appx. (sitting, standing, lifting, and reaching are major life activities).  "If an individual is not substantially limited with respect to any other major life activity, the individual's ability to perform the major life activity of working should be considered.  If an individual is substantially limited in any other major life activity, no determination should be made as to whether the individual is substantially limited in working." 29 C.F.R. § 1630.2(j), Appx.

An impairment must be of a fairly large or considerable degree, which excludes minor physical hindrances to doing manual tasks. *Toyota Motor Manuf., Kentucky, Inc. v. Williams,* 534 U.S. 184, 196-97 (2002).  The impairment must also substantially hinder activities that are of central importance to daily life. *Id.* at 197.  An inherent facet of that requirement is that "[t]he impairment's impact must also be permanent or long term." *Id.* at 198.  Disability is to be determined on a case-by-case basis, and the criterion of that determination is not merely the name or diagnosis of an impairment; rather, it is the particular effect of the impairment on daily life. *Id.*  For example, an individual who, because of an impairment, can only walk for very brief periods of time would be substantially limited in the major life activity of walking." 29 C.F.R. pt.1630, Appx. § 1630.2(j) (1997).  "An individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." *Id.*; *see, e.g., Fornes v. Osceola County Sheriff's Office*, No. 6:04cv1124-ORL-31DAB, 2005 WL 2012285, *3 (M.D. Fla. Aug. 17, 2005) (Presnell, J.) (police officer who could no longer run not substantially limited in a "major life activity" central to daily life).

To meet this requirement, Plaintiff must be able to show that during the pertinent time period she was either prevented or severely restricted from major daily tasks such as walking, eating, or sleeping. *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 195-99 (2002); *Bragdon v. Abbott,* 524 U.S. 624, 637-38 (1998).  This is a high standard to meet. *Scheerer v. Potter,* 443 F.3d 916, 919 (7th Cir. 2006).  To survive summary judgment, Plaintiff must provide specific facts establishing that there is a genuine issue of material fact as to whether she is substantially limited in a major life activity and conclusory allegations will not suffice.  *Id.*

The VA contends that Plaintiff did not have an impairment that limited a major life activity in January to September 2002, the time period in which she alleges she was discriminated against. Plaintiff argues in her Response that she was disabled during the relevant time period from back and hearing problems[5].  The VA concedes that Plaintiff had two physical impairments[6] within the meaning of the statute during the relevant time period: spondylolisthesis and hearing loss.  *See* 29 C.F.R. § 1630.2(h)(1).  However, the VA contends that neither of Plaintiff's impairments substantially limited her in any major life activity during the relevant time period.

### *Whether Plaintiff's Hearing Impairment "Substantially Limits" A Major Life Activity*

Plaintiff contends in her Response to Summary Judgment that her deafness "is almost total." Doc. No. 36-1 at 4.  However, as the VA points out, Plaintiff's testimony was that, at the time Plaintiff developed her hearing loss she began using a hearing aid device, which was a little box that looked like a recorder with phone lines into the ears that she wore walking around the SATP unit.  Doc. No.

---

[5]Although Plaintiff also alleges she suffers from a visual impairment, that did not occur until cranial surgery in August 2004, or two years after the relevant time period.  *See* Doc. No. 36-1 at 10; Doc. No. 36-4.

[6]The regulations define the term "physical or mental impairment" as "[a]ny physiological disorder, or condition . . . affecting one or more of the following body systems: . . . musculoskeletal." 29 C.F.R. § 1630.2(h)(1).

33-3 at 4 (Darwin Dep. at 67).  She subsequently chose to stop using that device because she found

that she could tell what patients were saying by "startin' to learn to look at [the patients'] faces."  *Id*.

Although hearing aids did not work for Plaintiff when she first tried them in August 2001, she testified

that they subsequently were working for her by January 2002.  Doc. No. 33-3 at 4-5 (Darwin Dep. at

68-69).  The VA also provided amplified telephone equipment to Plaintiff, which allowed her to

continue performing ASA work.  Doc. No. 33-8 (Herter Decl.) ¶ 3.

"A person whose physical or mental impairment is corrected by medication or other measures

does not have an impairment that presently 'substantially limits' a major life activity." *Sutton v.*

*United Air Lines, Inc*., 527 U.S. 471, 482-483 (1999).  The person whose physical impairment is

corrected by mitigating measures still has an impairment, but if the impairment is corrected, then it

does not "substantially limi[t]" a major life activity.  *Id*.  Because Plaintiff's hearing impairment was

corrected initially with the amplification box in August 2001, and later with surgery and effective

hearing aids by January 2002 (during the relevant time period), her hearing impairment did not limit

a major life activity.  It is also worth noting that Plaintiff herself did not list her hearing impairment

as one for which she sought accommodation in the "description of disability" section on the Request

for Reasonable Accommodation Form she turned in to her Supervisor[7].  Doc. No. 33-5 at 22.  Because

Plaintiff's hearing impairment with the use of hearing aids or amplification equipment was corrected,

it did not qualify as a disability.  *Cf. Woodford v. England,* 176 Fed. Appx. 726, 2006 WL 237988,

*1 (5th Cir. Feb. 1, 2006) (where plaintiff averred that even when using his hearing aid he still had

---

[7]Plaintiff did state in the "equipment needed" section in parenthesis that she was hearing impaired and required an amplified phone, which she already had.  Doc. No. 33-5 at 22.

difficulty hearing, a genuine issue of material fact existed regarding whether he may in fact be disabled).

### *Whether Plaintiff's Back Impairment "Substantially Limited" A Major Life Activity*

*Impairment and Limitations*--Plaintiff contends in her Response to the Summary Judgment Motion that her back impairment disabled her.  Although Plaintiff had injured her back at work in August 2001, she continued to work while being treated for the back problems up until January 22, 2002, when the pain became too overwhelming.  Dr. Davis initially placed Plaintiff on temporary disability leave stating, "Ms. Darwin is no longer able to work [secondary] to her severe low back condition and thus is on [temporary disability] until after anticipated surgery."  Doc. No. 33- 5 at 13, Ex. 4.  When approval for the back surgery was held up by the unresolved workers compensation issues, Dr. Davis later acceded to Plaintiff's demands in March that she return to work for financial reasons (because she had run out of sick leave), but he restricted her to "light duty with no patient physical contact due to back problems" as of April 1, 2002.  Doc. No. 33-5 at 19, Ex. 7.  According to the Attending Physician portion of the Reasonable Accommodation form completed by Dr. Davis on April 2, 2002, Plaintiff was restricted in:  lifting up to ten pounds; walking up to twenty minutes; standing up to ten minutes; and was allowed no reaching, limited bending or stooping, and minimal to no pushing or pulling.   Doc. No. 33-5 at 21, Ex. 8.

Plaintiff's testimony indicates that even with her back injury in August 2001 she was exceeding these limitations; however, her testimony about her abilities is not entirely controlling where it contradicts with restrictions established by her treating physician.  Although Plaintiff testified that between August 2001 and January 2002 she had performed the more extensive duties of a charge nurse, rather than the strictly sedentary position performing ASA work, this was without the knowledge of Dr. Davis, because SATP was often short-handed on the unit. Doc. No. 33-4 at 4

(Darwin Dep. at 127) ("I wasn't lettin' him know I was goin' against his order and doing a lot of this stuff").  Plaintiff testified with regard to her back impairment in performing the charge nurse duties: "I never let my back, no matter how bad it was hurting, stop me from doing anything.  If somebody needed CPR, I would have got down and done it if it killed me."  Doc. No. 33-3 at 3 (Darwin Dep. at 63).

The Court will use the more conservative restrictions set forth by Dr. Davis in April 2002[8], because in considering a Motion for Summary Judgment, the facts must be read in the light most favorable to Plaintiff.  In addition, the VA supervisors were asked to accommodate Plaintiff based on the doctor's written restrictions and she would arguably have been "regarded as" having those restrictions by her supervisors, whether she was capable (in her personal, non-medical opinion) of exceeding them or not.  *See Rossbach v. City of Miami*, 371 F.3d 1354, 1359 (11th Cir. 2004) (holding district court should have considered whether employees were "regarded as" disabled); *see also Shannon v. Henderson*, 275 F.3d 42, 2001 WL 1223633, *7 (5th Cir. Sep. 25, 2001) (unpublished decision) (doctor's restrictions filled out on employer's work restriction form were "perhaps the best evidence available of employee's ability to perform major life activities").

*Walking and Standing*--According to the restrictions set by Dr. Davis, Plaintiff was limited by her back impairment in the major life activities of walking no more than twenty minutes per hour and standing no more than ten minutes per hour[9] while at work.  Doc. No. 33-5 at 21, Ex. 8.  The appellate courts have generally held that the inability to stand, or to take breaks from standing, does

---

[8]Plaintiff was on leave from January 22, 2002 until she returned to work on April 1, 2002.

[9]A fair reading of the Reasonable Accommodation form is that the walking limitations are per hour.  *See* Doc. No. 33-5 at 21, Ex. 8.  Plaintiff testified that Dr. Davis told her that she could walk around "for 20 minutes out of the hour" and that is what he meant on the form.  Doc. No. 33-4 at 4 (Darwin Dep. at 128); Doc. No. 33-3 at 10 (Darwin Dep. at 91).

not make a condition disabling.  *See, e.g., Rossbach v. City of Miami*, 371 F.3d 1354, 1357 (11th Cir. 2004) (officers who could not stand for "long" or "extended" periods of time were not substantially limited); *Dupre v. Charter Behavioral Health Sys.*, 242 F.3d 610, 614 (5th Cir. 2001) (inability to stand in one place for up to one hour not a disability); *Taylor v. Pathmark Stores, Inc.,* 177 F.3d 180, 186 (3d Cir. 999) (no disability where employee required hourly breaks while standing or walking); *Colwell v. Suffolk County Police Dep't,* 158 F.3d 635, 644 (2d Cir. 998) (inability to stand for "any period of time" not a disability).  The Court finds that Plaintiff is not substantially limited in the major life activity of standing because a restriction of standing for no more than ten minutes per hour is not a substantial limitation as compared to the amount of standing most people do in their daily lives.

Plaintiff was restricted from walking more than twenty minutes each hour during the work day.  For an individual to be considered disabled with regard to the major life activity of walking, the limitation on an individual's ability to walk must be permanent or cover a long period of time and must be considerable compared to the walking most people do in their daily lives. *See E.E.O.C. v. Sears, Roebuck & Co.,* 417 F.3d 789, 802 (7th Cir. 2005).  According to Plaintiff's testimony, her back impairment did impact her activities, but, as she acknowledged, she was able to continue exercising even after she injured her back, by doing water aerobics and walking on the treadmill at a local gym through 2002. Doc. No. 33-2 at 13-14; 33-3 at 1 (Darwin Dep. 48-50; 54).  Plaintiff could still drive on long trips, including a lengthy trip to West Virginia, and do routine household work, such as cooking and light laundry.  Doc. No. 33-2 at 14 (Darwin Dep. at 51-54).

The inability to walk for even a quarter-mile has been held not to be substantially limiting. *See, e.g.*, *Wood v. Crown Redi-Mix, Inc.*, 339 F.3d 682, 685-86 (8th Cir. 2003) (employee's back injury which limited his ability to walk to approximately one-quarter of a mile before he was required to rest

and caused numbness in his foot and leg was a moderate limitation that did not substantially limit employee's ability to engage in major life activity of walking); *see also Kelly v. Drexel Univ.,* 94 F.3d 102, 105-07 (3rd Cir.1996) (rejecting the disability discrimination claim of an individual who could not walk "more than one mile").  The Court finds that Plaintiff is not substantially limited in the major life activity of  walking because a restriction of walking for no more than twenty minutes per hour is not a substantial limitation as compared to the amount of walking most people do in their daily lives.

*Lifting*--Plaintiff was also limited to lifting no more than ten pounds; with no reaching, limited bending or stooping, and minimal to no pushing or pulling.  Plaintiff testified that although she was unable to bend over at the waist to pick up an item off the floor or lift something, but she was able to squat down with her knees to lift.  She could also reach overhead to remove items from an overhead cabinet so long as she stood on a step stool.  Darwin Dep. 54-55.  Plaintiff explained that she had "learned to live with it.  I mean, I've learned to tolerate, and do these things and know not to do anything that could jeopardize it any further."  Darwin Dep. 54-55.

A "diminished activity tolerance for normal daily activities such as lifting, running, and performing manual tasks, as well as a lifting restriction, [does] not constitute a disability under the ADA."  *Chanda v. Engelhard/ICC*, 234 F.3d 1219, 1222 (11th Cir. 2000) (plaintiff "acknowledged an ability to assist his spouse with household activities, to dress and feed himself, and to drive an automobile."); *see also Wood v. Crown Redi-Mix, Inc.,* 339 F.3d 682, 685 (8th Cir. 2003) (plaintiff who could perform household tasks such as laundry, washing dishes, and taking out the trash had moderate restrictions which were inconvenient but insufficient to sustain ADA claim); *Snow v. Ridgeview Medical Center,* 128 F.3d 1201, 1207 (8th Cir. 1997) (holding as a matter of law "a general lifting restriction imposed by a physician, without more, is insufficient to constitute a disability within

the meaning of the ADA."); *Helfter v. United Parcel Service, Inc.,* 115 F.3d 613, 617 (8th Cir.1997) (ten pound lifting restriction limited to work-related activities did not create summary judgment issue on other major life activities). Plaintiff's inability to lift more than ten pounds was not a substantial limitation on a major life activity, other than as it related to working.

      *Working*--Because Plaintiff is not substantially limited in her ability to perform other major life activities, the Court must consider whether Plaintiff is substantially limited in the major life activity of working. *See* 29 C.F.R. pt. 1630, Appx. § 1630.2(j). The inability or perceived inability to perform a single, particular job is not a substantial limitation on the major life activity of working. *See* 29 C.F.R. § 1630.3(j)(3)(I). "[A]n impairment must preclude – or at least be perceived to prelude – an individual from more that one type of job, even if the job foreclosed is the individual's job of choice." *Rossbach v. City of Miami,* 371 F.3d 1354, 1359 (11th Cir. 2004) (citing *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 492 (1999)). To qualify as a disability, an impairment must preclude or be perceived to preclude performance of a "class of jobs" or "broad range of jobs." *Id.* at 1360. "If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs. Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs." *Sutton,* 527 U.S. at 492. The factors to be considered include: the number and type of jobs from which the impaired individual is disqualified; the geographical area to which the individual has reasonable access; and the individual's job training, experience, and expectations. 29 C.F.R. § 1630.2(j)(3)(ii).

      The VA contends that Plaintiff does not assert that she is substantially limited in the major life activity of working because she asserts that she was able to return to her prior SATP position. Plaintiff has failed to offer any evidence showing that she is significantly restricted in the ability to

perform a "class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities."  *See Gordon v. E.L. Hamm & Assoc., Inc.,* 100 F.3d 907, 912 (11th Cir. 1996).  Plaintiff testified that her former position of charge nurse or "residential" nurse would require physical contact with patients and she would not have been capable of moving patients from a stretcher to a bed or things like that.  Doc. No. 33-3 at 12 (Darwin Dep. at 97).

Plaintiff has failed to meet her burden of showing that she suffers from an impairment that substantially limits her ability to work, and in fact her testimony supports the opposite conclusion, that there were other medical professional positions that she had the ability to perform. Plaintiff testified that she could have performed a nursing position "if it was one of the ones that passed medications or something like that."  Doc. No. 33-4 at 1 (Darwin Dep. at 116).  Plaintiff also testified that she could have performed in positions for registered nurses who were responsible for entering medical data codes, such as for insurance benefits[10].  Doc. No. 33-4 at 14 (Darwin Dep. at 168).  As such, the Court finds Plaintiff was not substantially limited in the major life activity of working.

### Whether Plaintiff Was Otherwise Qualified

Even assuming *arguendo* that Plaintiff had a disability within the meaning of the Rehabilitation Act, Plaintiff would also have to establish that she is a "qualified individual with a disability" such that she was able to perform the essential functions of the job with or without reasonable accommodation. *Sutton v. Lader*, 185 F.3d 1203, 1210 (11th Cir. 1999). To be a "qualified individual with a disability," Plaintiff must be able to perform the essential functions of the position. Plaintiff vaguely asserts that she would have been able to work if she returned to doing ASA work, or to a nursing position without patient contact, or as a charge nurse with a second nurse to help her

---

[10]However, there is no evidence that such positions were vacant or available at the VA Medical Center.

in certain aspects of the position. *See* Doc. No. 33-5 at 15, Ex. 5.  The VA maintains that (1) the ASA work was temporarily assigned to her and (2) Plaintiff could not perform the essential functions of the position as a charge nurse.  Doc. No. 33-1 at 12.

Essential functions are the "fundamental job duties of a position that an individual with a disability is actually required to perform." *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000) (citing 29 C.F.R. § 1630.2(n)(2)(I)).  The factors to consider when deciding whether a particular task is an essential function include these things:  (1) the amount of time spent performing the function; (2) the work experience of past and current holders of the position; and (3) job requirements as described in a written job description. 29 C.F.R. § 1630.2(n)(3)).  There is no obligation under the statute to employ people who are not capable of performing the duties of their employment.  *See Sutton*, 185 F.3d at 1211.

Under Eleventh Circuit precedent, "While legitimate physical qualifications may be essential to the performance of certain jobs, both that determination and the determination of whether accommodation is possible are fact-specific issues.  The court is obligated to scrutinize the evidence before determining whether the defendant's justifications reflect a well-informed judgment grounded in a careful and open-minded weighing of the risks and alternatives, or whether they are simply conclusory statements that are being used to justify reflexive reactions grounded in ignorance or capitulation to public prejudice." *Arline v. School Bd. of Nassau County,* 772 F.2d 759, 764-65 (1985), *aff'd,*480 U.S. 273 (1987).

Plaintiff has extensive nursing experience, with her most recent experience as the charge nurse in the Substance Abuse Treatment Program, which she performed from 1996 until August 2001, when she re-injured her back and was suffering from hearing problems.  Doc. No. 33-5 at 15, Ex. 5; Doc.

No. 33-3 at 2 (Darwin Dep. at 59).  Plaintiff's supervisor provided her with modified duties performing one-on-one addiction severity interviews and inputting the information.  Following ear surgery and obtaining hearing aids[11], Plaintiff was able to return to relieving the nurses on the residential unit of the substance abuse unit.  Plaintiff went on disability leave due to back problems on January 21, 2002.

As set forth *supra* at 4, from August 2001 to January 2002, Plaintiff was assigned to a temporary duty assignment inputting ASI forms and interviewing patients face-to-face.  Doc. No. 33-7 (Wilson Decl.) ¶ 4-5.  In her position as a residential or "staff nurse" at Bay Pines VA Medical Center, Plaintiff conducted admitting interviews of patients; took admission vital signs; did data entry of interviews, assessments, progress reports; talked with patients one-on-one; made rounds on the unit to observe residents; conducted breathalysers and collected urine samples for drug screening; and conducted weekend orientation classes for new admissions.  Doc. No. 33-5 at 15, Ex. 5.  Plaintiff continued doing regular nursing duties on the SATP unit until January 2002 when her doctor ordered her to go on leave due to her back problems.  When performing the regular charge nurse duties, Plaintiff was the only one on the unit on evening shift, night times, and weekends.  Doc. No. 33-3 at 3, 5 (Darwin Dep. at 61, 72).  During the day, when there were 36 patients on the floor, there would only be one nurse on, sometimes with an LPN assisting.  Doc. No. 33-3 at 3 (Darwin Dep. at 71).  During admissions week (once a month) there would be two RN's on for the admissions.  Doc. No. 33-3 at 3 (Darwin Dep. at 72).

Up until January 2002, Plaintiff would make rounds – counting the patients as a residential unit, do breathalyzer tests on the ones who had gone home for the weekend, and teach new patients

---

[11]*See* Doc. No. 33-5 at 15, Ex. 5.

about substance abuse.  Doc. No. 33-3 at 2-3 (Darwin Dep. at 60-61).  Plaintiff did believe that the

SATP could be considered a high-risk unit because she had had several confrontations on the unit,

including one with an individual who was removed by law enforcement.  Doc. No. 33-3 at 3 (Darwin

Dep. at 61).

Plaintiff testified that she believed she could have returned to the duties of a residential nurse,

although she conceded that she would have had problems accomplishing some of the responsibilities.

Plaintiff admitted that she would have trouble making rounds to check on the patients because, as she

conceded, her walking restriction would have impacted that part of the job.  Doc. No. 33-3 at 12

(Darwin Dep. at 100) ("I could have – I could have cut them like in half, taken part of the share, and

rested up or something and gone for the rest of them").   For admissions duties or assessing patients

physically, Plaintiff admitted that she would have required assistance.  "I probably would have had

to have help on admission days with the patients that came in, because you have to do a lot of walking

and showing them around."  Doc. No. 33-3 at 12 (Darwin Dep. at 98).  Plaintiff also admitted she

would have needed assistance "[a]ssessing the patient physically."  Doc. No. 33-3 at 12 (Darwin Dep.

at 99).

Plaintiff sent Ms. Wilson an email on March 26, 2002 that said she had visited her

orthopedic's office that morning and he "has agreed to return me to light duty (against his better

judgment) due to financial hardship.  Doc. No. 33-5 at 17, Ex. 6.  "The return to work is for Monday

April 1st, following 5 days on the [treatment].  Surgery is postponed [sic] until WC makes a decision,

which might take forever. . . . Hope you can find something for me to do."  *Id.*

The note from Dr. Davis read:  "Patient may return to light duty 04/01/02 with no patient

physical contact due to back problems."  Doc. No. 33-5 at 19, Ex. 7.  Plaintiff's doctor advised her

not to go back to work because she needed to have the back surgery first.  Doc. No. 33-3 at 7 (Darwin

Dep. at 77).  Plaintiff understood the note to mean that she could not do anything physically with

patients that would hurt her back. Doc. No. 33-3 at 7 (Darwin Dep. at 80).   Dr. Davis defined

Plaintiff's restrictions as: lifting - ten pounds; walking - "20 min."; standing - "10 min."; no reaching;

limited bending or stooping; "minimal to none" push/pull requirements; and "no [work on] high risk

units."   Doc. No. 33-5 at 21, Ex. 8.  In her Request for Reasonable Accommodation, Plaintiff

described the job duties that she could not do as: "lift, carrying, turn, push, pull patients, take downs,

and high risk areas."  Doc. No. 33-5 at 22.

   As the VA points out, the job of a charge nurse requires standing and walking[12], and Dr. Davis

opined that Plaintiff needed a light duty position with many restrictions due to her back impairment.

Doc. No. 33-6 at 9, Ex. 14; Doc. No. 33-7 (Wilson Decl.)  ¶ 17.  Because of Plaintiff's back problem,

Dr. Davis initially removed her from work completely pending surgery; he only allowed her to return

to work against his better judgment. Plaintiff admitted that she did not discuss the physical

requirements of her work as a charge nurse with Dr. Davis because she was going against his orders.

Darwin Dep. at 127.

   The VA does not have a duty to provide another nurse or orderly just to enable Plaintiff do

fulfill the responsibilities of a charge nurse.  Directly on point is *Mays v. Principi,* 301 F.3d 866 (7th

Cir. 2002), in which a nurse with back problems, restricted to light duty, sued the VA for its failure

to  accommodate her.  The Seventh Circuit held:

> It is evident that with no light-duty nursing positions open our plaintiff could not hold
> a job that required contact with patients, because, if they are heavy, as so many
> Americans are, she would not, limited as she is to lifting 10 pounds, be able to support

---

[12]Plaintiff's disputed ability to perform CPR is addressed below in terms of reasonable accommodation.

them if they needed help walking (as they often do), to break their falls (which are frequent in a hospital), to help them into and out of bed, or to pick them up from the floor after they have fallen. *The hospital could not be required to pair her with another nurse, or an orderly, who would follow her around to help her lift patients. See Hansen v. Henderson, supra,* 233 F.3d at 523 ("the job that Hansen would like would be a job in which another worker does the sorting, then gives Hansen the mail to case, and then when Hansen has done that carries the cases to the truck, and Hansen then makes just curbside deliveries . . . Two new jobs would have to be manufactured, one for Hansen and one for his helper. The Act does not require that"); *EEOC v. Amego, Inc.,* 110 F.3d 135, 148 (1st Cir.1997). There was no reasonable accommodation that would have enabled the plaintiff to return to her old job as a regular staff nurse.

*Id*. at 871-72 (emphasis added).  Plaintiff conceded that during the time that Plaintiff performed the duties of a charge nurse there were responsibilities that she could not do with her impairments and another nurse had to be brought in to assist her.  Doc. No. 33-3 at 5 (Darwin Dep. at 72).

In this case, the VA was not required to pair Plaintiff with another nurse on a permanent basis to help her do the admissions or physical assessments.  The Court finds that Plaintiff was not a "qualified individual with a disability" because she was not able to perform the essential functions of the position with or without a reasonable accommodation and no permanent position existed for performing the ASA work.

### Whether Plaintiff Was Reasonably Accommodated

The VA also contends that Plaintiff cannot maintain a claim that the VA failed to reasonably accommodate her because she never really identified an accommodation for her back impairment, instead, sticking steadfastly to her conviction to remain a charge nurse.  As the VA acknowledges, that is an admirable goal, but one that could not be accommodated given Plaintiff's restrictions and the lack of any non-direct patient care positions for registered nurses.

To establish a claim of failure to reasonably accommodate a disability, a plaintiff must prove: (1) she has a disability within the meaning of the statute; (2) defendant had notice of her disability; (3) with a reasonable accommodation she could perform the essential functions of her position; and (4) the defendant refused to make such accommodations.  *See Stone v. City of Mt. Vernon*, 118 F.3d 92, 96-97 (2d Cir. 1997); *Ballard v. Rubin*, 284 F.3d 957, 960 (8th Cir. 2002); *Taylor v. Phoenixville Sch. Dist.*, 174 F.3d 142, 165 (3d Cir. 1999).  An employer must provide reasonable accommodations for employees with known disabilities unless the accommodations would cause undue hardship to the employer. *Earl v. Meryns, Inc.,* 207 F.3d 1361, 1365 (11th Cir. 2000).   Accommodations are reasonable, and thus required under the Act, only if they allow the employee to perform her essential job functions. *Id.* Plaintiff has the burden of identifying a reasonable accommodation that would allow her to perform the essential functions of her job.  *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255-56 (11th Cir. 2001); *Stewart v. Happy Herman's Cheshire Bridge, Inc.,* 117 F.3d 1278, 1286 (11th Cir. 1997).

In this case, Plaintiff sought to be returned to a position in SATP, where she believed that her "hearing loss and back injury could be accommodated" but she never states how it could be accommodated. Doc. No. 33-5 at 6-7, Ex. 2 (on VA Complaint form seeking "re-instatement to former position on SATP of interviewing and entering data on patients.") On the employee portion of the Request for Modified/Light Duty Work Assignment, to the category of "specific description of equipment which needs to be purchased," Plaintiff responded "None" except for an amplified phone and orthopedic chair which she already had.  Although Plaintiff sought not to be returned to a "high risk unit," she testified that wanted to be returned to SATP, despite her testimony that the SATP could

be considered a high-risk unit because she had had several confrontations on the unit, including one with an individual who was removed by law enforcement.  Doc. No. 33-3 at 3 (Darwin Dep. at 61).

Presumably Plaintiff wished to return to performing ASA work, performing one-on-one interviews and inputting data from forms.  However, the job of addiction severity assessment was routinely performed by all employees in the SATP, including nurses, social workers and psychologists.  Doc. No. 33-7 (Wilson Decl.) ¶ 5.  In order to accommodate Plaintiff's August 2001 back injury and hearing problems, Ms. Wilson temporarily reassigned those duties to Ms. Darwin from other employees pending a medical determination about her hearing.  *Id.*  Doc. No. 33-7 (Wilson Decl.) ¶ 4-5.  Employers are not required to create new positions or to "transform the position into another one by eliminating functions that are essential to the nature of the job as it exists." *Lucas*, 257 F.3d at 1260; *see also Sutton v. Lader*, 185 F.3d 1203, 1210 (11th Cir. 1999) (employers are not required to create positions as an accommodation).  Plaintiff realized that there might not be a position in the SATP, saying in her March 26, 2002 email before her return: "Hope you can find something for me to do."  Doc. No. 33-5, Ex. 6.  At the time Plaintiff talked to Ms. Wilson about returning to work in late March 2002, Plaintiff knew that the ASA work was being performed by other employees.  Doc. No. 33-3 at 8 (Dep. at 81-82).

In *Joelson v. Department of Veterans Affairs,* a case with very similar facts, a nurse with a back impairment indisputably could not perform direct patient care in the ICU, but argued that the VA should transfer her to her former job in quality management.  177 F.Supp.2d 967, 971-72 (D. N.D. 2001).  However, the quality management positions had been eliminated for nurses pursuant to a national directive.  *Id.*  The court rejected the plaintiff's contention that she should be evaluated in light of the position that had been eliminated.  *Id.*  In this case, the ASA work was temporary and was

later reassigned to other employees; thus, a non-direct patient care or sedentary position did not exist.

The fewer alternative positions available in the "employer's enterprise in the way of reasonable accommodations to the employee's particular disability, the less there is to consult about with a disabled employee seeking an alternative or reconfigured job with the employer." *Mays v. Principi,* 301 F.3d 866, 871-72 (7th Cir. 2002).  The VA considered Plaintiff's request for reasonable accommodation, to be assigned to a "light duty" position, and rejected it, because of Plaintiff's unresolved hearing loss and her physical restrictions which precluded her from performing CPR.  Doc. No. 33-5 at 23.  The Court will not second-guess the VA's requirement that all registered nurses with patient contact be capable of performing CPR in the event of an emergency even if such occasions were rare in Plaintiff's personal experience.  *Cf. Fornes v. Osceola County Sheriff's Office,* Civ. No. 6:04cv1124-ORL-31DAB, 2005 WL 2012285, *5 n.1 (M.D. Fla. Aug. 17, 2005) ("[L]aw enforcement is a profession that has its moments of great need.  The Court would be hard pressed to find running and similar abilities unreasonable requirements for law-enforcement officers.").  Although Dr. Davis eventually wrote a letter to the VA stating that Plaintiff was capable of occasional CPR, the Reasonable Accommodation Committee did not have a chance to consider it because the medical update questionnaire form was not returned by Dr. Davis' office until October 1, after Plaintiff had voluntarily retired.  Although the VA suggested that Plaintiff apply for non-nursing positions, Plaintiff was not interested in pursuing non-nursing positions and did not apply for one despite repeated prompting from the VA.  Neither of the "ideal" accommodations from Plaintiff's standpoint – restoring her to the SATP regular nursing job doing only ASA work or the charge nurse position with help performing walking or physical assessment duties from a second nurse – was reasonable.  The ASA work had been redistributed back to the other employees and did not exist any more and it would

not have been a cost-justified accommodation to pair another employee with her to do the walking, admissions, and assessment duties. *See Mays,* 301 F.3d at 872.

Plaintiff also contends that the VA retaliated against her for complaining to the union about the planned reassignment of the registered nursing positions from SATP to another unit and replacement with lesser-trained nursing staff. On March 27, 2002, Plaintiff's supervisor sent an email that proposed the transfer of nurses to another unit due to "a nursing shortage and the fact that we are in a hiring freeze." Doc. No. 33-6 at 15. On April 1, 2002, Plaintiff's supervisor sent an email to the affected nurses giving them "official notice" that "by Union Regulation, the four most Junior RN positions" would be transferred effective April 22, 2002. Doc. No. 33-6 at 15, Ex. 16. After Plaintiff received the email, she complained to the Union, and the plan was halted. Because the Court finds that Plaintiff failed to propose a "reasonable" accommodation, the VA could not have failed to accommodate her in retaliation for the Union complaint. In addition, Plaintiff testified that no one had ever told her they were upset about her going to the Union. Doc. No. 33-4 at 7 (Darwin Dep. at 137).

The Court finds that Plaintiff was not otherwise qualified for the charge nurse position, and there is no evidence that a reasonably accommodating nursing position existed; thus, Plaintiff's claims for violation of the Rehabilitation Act cannot survive summary judgment. It is respectfully **RECOMMENDED** that the VA's Motion for Summary Judgment be **GRANTED.**

### *Other Claims*

Plaintiff vaguely alleges discrimination in the way in which her worker's compensation claim was processed by a VA employee, Catherine Cramer. However, Plaintiff testified that she was not sure of the reason why Ms. Cramer might have discriminated against her. Darwin Dep. at 148-50 ("I

don't know. I don't understand. Because what she's doing is denying not only me but all the other employees from medical care. And, like losing my records or destroying my records, I mean, what would that benefit her unless she gets a kickback for not putting through claims.").

Plaintiff contends that her voluntary decision to retire as of September 30, 2002 was a constructive discharge, in that she forced to retire because she had a lack of income (due to denial of workers compensation benefits).  Generally, a voluntary retirement is not considered a constructive discharge. *See, e.g.*, *Vega v. Kodak Carribean, Ltd.,* 3 F.3d 476, 478 (1ˢᵗ Cir. 1983) (holding no violation of the discrimination laws from a constructive discharge, even though employer "encouraged workers to participate" in the retirement plan).  Moreover, the evidence in the record indicates that Plaintiff considered and discussed the possibility of retirement in April 2002 with her supervisor, leaving her a note on April 2, 2002 that she intended to retire at the end of the month, but she had "a lot of details to work out yet with Human Resources, etc. about retirement pay."  Doc. No. 33-7 ¶ 16; Doc. No. 33-6 at 20, Ex. 18; *see also* Doc. No. 33-8 ¶ 3 (Plaintiff initially contacted Herter in October 2000 about retirement benefits).  At that point, Ms. Wilson told Plaintiff that she would find temporary work for her until her retirement was processed, expecting it at the end of the month.  Doc. No. 33-7 ¶ 16.  Ms. Wilson later learned that Plaintiff spoke to Human Resources and decide to wait until her worker's compensation papers were processed.  *Id.*  In early May 2002, Plaintiff's son died and she told her supervisor again that she wanted to retire, and Ms. Wilson advised her to wait to make a final decision.  *Id.*

Plaintiff learned at some point that if she took a disability retirement because of her impairments, she would not be able to keep her life insurance.  Doc. No. 33-4 at 8 (Darwin Dep. at 141).  Plaintiff also learned that she would have to redeposit "43 years of interest" from a payout early

in her nursing career when she left federal employment in order to maximize her retirement benefits. Doc. No. 33-9 at 3. Plaintiff responded that she could not afford to pay it back at that point in time. *Id*.

Plaintiff also pursued information regarding a potential buyout during the April 2002 time frame.  Doc. No. 33-4 at 8 (Darwin Dep. at 144). Plaintiff wrote a series of emails to Human Resources in April 2002 seeking more information about how the retirement benefits worked. Doc. No. 33-9.  In one email, Plaintiff expressed her displeasure at the registered nurses being reassigned to the Acute Psychiatry Unit and stated:  "I will probably go out the last week of April or the first week of May." *Id.* at 2.  On April 5, 2002, Plaintiff again stated she planned "on voluntary retirement around the first of May."  *Id*. at 4.  Plaintiff's vague allegations that she was "forced" to retire, or constructively discharged, do not survive summary judgment.

Plaintiff also vaguely alleges, but fails to produce any evidence, that the VA's actions were based on her gender or her age.  She testified that there was "nothing about age" in any emails that were written about her retiring, that she did not believe that she was not accommodated based on her gender, and that even comments about her looking younger than her true age were meant as flattery. Doc. No. 33-4 at 7-9, 11 (Darwin Dep.  138, 140-45, 156-58).  Moreover, age and sex discrimination claims are not asserted in her Complaint, and not before the Court; thus, they are waived and do not survive summary judgment.  Doc. No. 1.

## CONCLUSION

Plaintiff was a hard working registered nurse who suffered a number of impairments that made continuing her career difficult and, as to some specific positions, medically inappropriate.  It is natural to sympathize with her circumstances, and, in a more perfect world, some suitable and productive

substitute employment might have been available.  However, the statutes on which she relies mandate precise elements that must be established to prevail on a claim of discrimination or failure to accommodate.  In her filings, Plaintiff has failed to adduce evidence showing genuine issues as to facts material to her claims.  Summary judgment is thus appropriate.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on May , 2006.

*David A. Baker*
_____
DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Unrepresented Party
Courtroom Deputy